UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

OAKLAND COUNTY,
a municipal corporation, and
ANDREW E. MEISNER,
Oakland County Treasurer,

      Plaintiffs,

  v.

FEDERAL NATIONAL MORTGAGE
ASSOCIATION,
a federally chartered corporation,
FEDERAL HOME LOAN MORTGAGE
CORPORATION,
a federally chartered corporation, and
FEDERAL HOUSING FINANCE AGENCY,

      Defendants.

Case No. 2:11-cv-12666-VAR-LJM

Hon. Victoria A. Roberts
United States District Judge

Hon. Laurie J. Michelson
United States Magistrate Judge

___

FOLEY & LARDNER LLP
ANN MARIE UETZ (P48922)
ADAM J. WIENNER (P71768)
*Attorneys for Federal National Mortgage Association*
500 Woodward Avenue, Ste. 2700
Detroit, MI 48226-3489
Phone: (313) 234-7100

FOLEY, BARON & METZGER, PLLC
CLYDE M. METZGER (P31040)
THOMAS J. FOLEY (P31111)
*Attorneys for Federal Home Loan Mortgage Corporation*
38777 Six Mile Road, Ste. 300
Livonia, MI 48152
Phone: (734) 742-1880
Fax: (734) 521-2379

ASIM VARMA (D.C. Lic. No. 426364)
HOWARD CAYNE (D.C. Lic. No. 331306)
MICHAEL JOHNSON (Va. Lic. No. 41588)
*Attorneys for Federal Housing Finance Agency*
ARNOLD & PORTER LLP
555 12th Street N.W.
Washington, DC 20004
Phone: (202) 942-5000
Asim.Varma@aporter.com
Howard.Cayne@aporter.com
Michael.Johnson@aporter.com

STEPHEN E. HART (D.C. Lic. No. 033379)
FEDERAL HOUSING FINANCE AGENCY
400 7th Street S.W.
Washington, DC 20024
Phone: (202) 649-3053
Stephen.Hart@fhfa.gov

**DEFENDANTS' RESPONSE TO THE ORDER DATED MAY 11, 2012**

**DEFENDANTS' RESPONSE TO THE ORDER DATED MAY 11, 2012**

Defendants Federal National Mortgage Association ("Fannie Mae"), Federal Home Loan Mortgage Corporation ("Freddie Mac," and with Fannie Mae, the "Enterprises"), and Federal Housing Finance Agency ("FHFA") (collectively, "Defendants") respectfully submit this response to the Court's order dated May 11, 2012, in which the Court ordered Defendants to submit a written explanation of (1) how Defendants store their sales data in various counties, and (2) the process by which a judgment against them would be handled in the event the Enterprises go into receivership.  *See* Doc. # 72.  The Enterprises respond to the first inquiry and FHFA responds to the second as follows.

**I.      HOW DEFENDANTS STORE THEIR SALES DATA IN VARIOUS COUNTIES**

While a full discussion of the factual and legal merits of Plaintiffs' damages claim is beyond the scope of this Memorandum, at this time Defendants believe the following information may be needed to determine the putative amount of damages due on Plaintiffs' claim for payment of real estate transfer taxes pursuant to MCL 207.502 and 207.523:[1]  (1) identification of the particular sales transactions for which Plaintiffs assert that the real estate transfer tax is due; (2) the purchase price for each such sale; and (3) whether the real estate transfer tax has already been paid on that transaction.  Because a six-year statute of limitations applies to Plaintiffs' claim, *see* MCL 600.5813, this information would need to cover the time period from mid-2005 to 2012.  As described below, both Fannie Mae and Freddie Mac retain

---

[1]   This Memorandum addresses the information required with respect to "sales data" as required by this Court's May 11 Order and thus reflects transactions in which Fannie Mae or Freddie Mac was the seller or grantor of real estate.  This Memorandum does not address transactions in which Fannie Mae or Freddie Mac was the grantee of a sheriff's deed or deed in lieu of foreclosure.

sales data for single-family residential properties (real estate owned or "REO" properties) in an electronic form.

### A.     Data Available from Fannie Mae and Freddie Mac

Fannie Mae maintains inventory and sales data for single-family REO properties in the State of Michigan in an electronic database known as the Credit Loss Management System (the "CLM System").[2] Fannie Mae estimates that it was the grantor in approximately 65,000 sales transactions for single-family REO properties in the State of Michigan between 2005 and the present. The CLM System contains information regarding these sales transactions dating back to at least 2005, and generally[3] includes information such as the property address, Fannie Mae loan number, REO identification number assigned by Fannie Mae for the property ("REO ID number"), purchaser name, and the closing title company and sales price for REO properties that have been sold. Fannie Mae also maintains an electronic imaging system ("Documentum") that contains copies of certain documents related to single-family REO sales transactions in the State of Michigan, including copies of the form Settlement Statement (HUD-1) ("HUD-1") for each such transaction. However, the information contained in the Documentum system dates back only to mid-2010. For transactions prior to mid-2010, the HUD-1 form would need to be obtained from the applicable title company for each transaction.

---

[2]   With respect to multi-family residences, Fannie Mae was the grantor for only a much smaller number of sales transactions as compared with single-family residential properties. Fannie Mae does *not* have an electronic database that would allow Fannie Mae access to an electronic listing of these transactions with the same information indicated above for single-family residential properties. Accordingly, Fannie Mae would need to manually review its files or documents obtained from the relevant title company in order to identify the information required to assess transfer taxes for multi-family sales.

[3]   The data contained in the CLM System may contain certain inaccuracies or omissions based on, for example, human error or data corruption.

Fannie Mae can search the CLM System using the address for the subject property or using the Fannie Mae loan number. While it is possible for Fannie Mae to search the CLM System for properties within a particular county, ZIP code, or municipality, Fannie Mae cannot verify that such searches would accurately reflect all such transactions without cross-checking that information with other data — namely, the sales price or property address for the subject properties. For example, the CLM System may erroneously indicate that a property is located in a particular county when it is actually located in a different county, or the county information may be inadvertently omitted from the CLM System altogether.

The CLM System does not reflect whether Fannie Mae or another party associated with the transaction previously paid the real estate transfer tax in connection with each sales transaction. Determining whether the real estate transfer tax was previously paid requires a three-step process. First, Fannie Mae would need to use the property address or Fannie Mae loan number to search its CLM System in order to obtain the REO ID number. Second, once the REO ID number is identified, then Fannie Mae would search Documentum using the REO ID number or obtain documents from the applicable title company for properties that pre-date mid-2010 in order to access documents created in connection with the sales transaction, which would include the HUD-1. Third, Fannie Mae would then need to select and manually review each such HUD-1 in order to confirm whether the real estate transfer tax was paid. Fannie Mae believes the law firms that have handled its real estate sale transactions in Michigan since 2005 would have to perform a similar manual review of the applicable HUD-1 in order to confirm whether the real estate transfer tax was paid. Fannie Mae believes that it has paid transfer taxes for some but not all single-family residential real estate sales in 2010 and 2011.

Freddie Mac also stores sales data electronically for single-family REO properties — properties that Freddie Mac sold as grantor — in the state of Michigan.[4] This data is available dating back to at least the beginning of 2005 and through the present. Freddie Mac stores inventory and sales data in a proprietary software program called HomeSteps Connect. This data is both searchable and extractable. For REO property transactions, HomeSteps Connect is able to extract data into an Excel spreadsheet that describe transactions based on numerous categories. These categories include full address, city, county, sale and closing date, purchaser name, consideration, and Freddie Mac loan number. Based on queries of this data, initial estimates are that, between June 2005 and June 2012, Freddie Mac was the grantor on nearly 30,000 transactions across the State of Michigan.

Although Freddie Mac's HomeSteps Connect software does not contain data identifying whether transfer taxes were paid on a particular REO sale, that data is stored electronically by the two law firms that handle nearly all of Freddie Mac's REO closings in Michigan. At present, Freddie Mac believes some manual cross-referencing between the law firms' transfer tax payment records and Freddie Mac's REO sales records would be needed to eliminate those transfers on which transfer taxes were paid.

---

[4] Transaction data for multifamily homes is also likely to be available electronically. Regardless, however, Freddie Mac believes that only 4 such multifamily transactions occurred in Michigan during the relevant time period.

### B. To Ensure Accuracy, Data From Fannie Mae and Freddie Mac May Need to Be Reconciled With Plaintiffs' Data.

Although the Enterprises maintain data electronically, the format and accessibility of the data does not ensure its accuracy or completeness, nor does it ensure that the Enterprises' data match the data the counties maintain to identify transactions on which they believe tax is owed (and the amount of tax owed on those transactions). In order to ensure the most accurate data, the parties would need to reconcile available deed data the Enterprises maintain with data maintained by the counties. As described below, reconciling Plaintiffs' data and the Enterprises' data may not be an easy task.

Plaintiffs previously provided a spreadsheet identifying the sales transactions that they contend are subject to the claim for payment of the transfer taxes. The information provided by Plaintiffs is organized by the property identification number (PIN) for each property at issue and does not include the street address for each parcel. Importantly, a PIN is a unique, government-generated number corresponding to each parcel of real estate in the State of Michigan. The Enterprises' proprietary software programs do not contain the PINs. Therefore, the Enterprises do not believe it is possible to use either Fannie Mae's CLM System or Freddie Mac's HomeSteps Connect system to verify the sales transactions provided by Plaintiffs without some additional manual work.[5]

However, the PIN does appear to be available in some form from the law firms that handle the Enterprises' REO transactions in Michigan. The accessibility and ease of accessing that data varies. It is also likely that, because the PIN may be recorded either with or without

---

[5]   Fannie Mae's CLM System is not searchable by the PIN assigned to the property.

dashes in the series of numbers, cross-matching by the PINs will not be seamless or automated if the counties and the law firms do not record the relevant numbers in the same way.

Certain of the law firms that have handled Fannie Mae's real estate sale transactions in Michigan since 2005 have advised that they maintain records of the Fannie Mae sales transactions that could allow Fannie Mae to connect the PINs submitted by Plaintiffs to the applicable REO ID number in order to verify the sales transactions identified by Plaintiffs. However, because of the variation in the formatting of the PINs and the difficulty of recovering data dating back to 2005, Fannie Mae may be unable to complete an accurate verification of all of the sales transactions identified by Plaintiffs.

Although the two law firms that have handled the vast majority of Freddie Mac's real estate sale transactions in Michigan since June 2005 record the PIN in their data systems, only one of these firms can extract that data going back to mid 2005.  The other firm, which has handled more than 70% of Freddie Mac's nearly 30,000 sale transactions since June 2005 (*i.e.*, 21,057 transactions), can only electronically extract data containing a PIN for transactions occurring during approximately the last two-and-a-half years.  This firm would have to manually search the files of all sale transactions taking place before approximately January 2010 (which Freddie Mac believes are nearly 9,000 transactions) and cut and paste the PIN into a spreadsheet to make the PIN data available to Freddie Mac.  Assuming that this manual process will take a couple minutes per file, compiling and checking a report to accurately reflect the PINs for nearly 9,000 transactions could easily take several hundred hours.

Defendants believe the most accurate way to reconcile the data would be to use the PIN because it is a number created by the county or state and should be unique for each property. However, cross-matching of the Enterprises' existing data and the counties' data may be able to

be done using other variables if using the PIN proves problematic. For example, the parties may be able to compare the data using purchaser name. Such comparison, however, is likely to produce discrepancies, for misspellings and duplicate names do occur. Indeed, based on a cursory review of the data Oakland County produced — data the Plaintiffs have identified as likely to be among the most complete and easiest to access — and the data available from Fannie Mae's CLM System and Freddie Mac's HomeSteps Connect system, some discrepancies in purchaser names were readily apparent. Some names were misspelled and purchasers' first names did not match. Because the data provided by Plaintiffs for Oakland County does not contain address information, additional manual work would need to be done in order to confirm whether two transactions with discrepancies in the names are, indeed, the same.[6] If one were to assume a small discrepancy rate (*e.g.*, 5 to 10%), given the magnitude of transactions at issue (an estimated 100,000), the parties may need to manually check at least 5,000 to 10,000 Enterprise transactions against either a paper or electronic deed to confirm their accuracy.

Finally, whether the comparison is done using the PIN or some other data point, there will likely be other discrepancies that need manual follow-up, including missing transactions or discrepancies in consideration. For example, in Freddie Mac's initial sampling of the data provided by Oakland County, some of the names in Oakland County's data did not appear in Freddie Mac's data. And several of the records contained a discrepancy as to consideration amount. Therefore, regardless of the method used to cross-reference transactions between data sets, there will likely be the need for manual review of files to resolve discrepancies between

---

[6] Moreover, even a comparison by property address (should it be available) would also likely produce discrepancies, for street addresses may repeat or have subtle variations (*e.g.*, road versus street; 1st Street versus First Street, *etc.*).

data on the same transaction. Again, even a small discrepancy could lead to the need to review documents for a significant number of transactions.

At bottom, even if the data sets may be culled electronically, reconciling the data maintained by Fannie Mae and Freddie Mac with the data maintained by the counties will entail manual work at both the front-end — *e.g.*, by compiling transactions by the PIN to create unique data sets that will be relatively easy to cross-match — and the back-end — *e.g.*, by manually checking discrepancies against existing paper or electronic records. This process would likely require hundreds of hours for the Enterprises to gather and compare data to ensure accurate damage calculations.

II. **THE PROCESS BY WHICH A JUDGMENT WOULD BE HANDLED IN THE EVENT THE ENTERPRISES GO INTO RECEIVERSHIP**

If Plaintiffs obtain a judgment against the Enterprises and the Enterprises thereafter go into receivership, Plaintiffs would be judgment creditors of the receivership. Upon FHFA's appointment as receiver, the conservatorships would immediately terminate. 12 U.S.C. § 4617(a)(4)(D). Plaintiffs would be entitled to pursue a claim against the receivership estate for the amount of the judgment. *Id*. § 4617(b)(3), (b)(5). The receiver would evaluate the claim and allow or deny it. *Id*. § 4617(b)(5)(A)(i). If a claim is allowed, the claimant is paid, subject to a statutory priority structure and the availability of funds, as discussed *infra*. If a claim is denied, the claimant may "file suit on [the] claim (or continue an action commenced before the appointment of the receiver)." *Id*. § 4617(b)(6)(A). A claim that is "determined [valid] by a final judgment of any court of competent jurisdiction" is to be treated, for purposes of payment, the same as a claim that is allowed by the receiver. 12 U.S.C. § 4617(b)(9)(i), (iii).

A statutory priority structure governs payment of receivership liabilities, including claims that are allowed by the receiver or judicially determined valid. *See* 12 U.S.C. § 4617(c)(1); 12 C.F.R. § 1237.9. Under that four-part structure, "administrative expenses" are given the highest priority, followed by "other general or senior liabilit[ies]", followed next by "obligation[s] subordinated to general creditors," followed finally by "obligation[s] to shareholders." *Id*. Plaintiffs' claim would be a general-creditor claim, and therefore if approved or judicially determined valid, it would fall into the second-highest priority category, subordinate only to administrative expenses of the conservator/receiver. *See id*.

A successful claimant may be paid in cash "to the extent that funds are available from the assets of the regulated entity" and "in such manner and amounts as are authorized under this section." 12 U.S.C. § 4617(b)(9)(A). If full payment is not made immediately in cash, cash dividends may be paid from time to time in complete or partial fulfillment of the underlying claim. *Id*. § 4617(b)(9)(C). Regardless of the manner in which the receiver resolves the Enterprises and winds up their affairs, successful claimants are entitled to receive at least what they would have received in a liquidation of the Enterprises' assets and liabilities. *See* 12 U.S.C. §§ 4617(c)(2)(B); 4617(e)(2).

FHFA, on behalf of each Enterprise, and the U.S. Treasury are parties to Senior Preferred Stock Agreements (the "Treasury Agreements")[7] under which the U.S. Treasury provides, on a quarterly basis and upon a request in compliance with terms and conditions set forth in the

---

7   *See* "Amended And Restated Senior Preferred Stock Purchase Agreement," *available at* http://www.fhfa.gov/webfiles/23898/seniorpreferredstockpurchaseagreementfnm1.pdf (agreement with Fannie Mae);
http://www.fhfa.gov/webfiles/23900/seniorpreferredstockpurchaseagreementfrea.pdf (agreement with Freddie Mac).

9

Treasury Agreements, funds sufficient to offset the amount by which each Enterprise's liabilities exceed its assets pursuant to Generally Accepted Accounting Principles.[8] The Treasury's obligations are defined and limited by the text of the Treasury Agreements, and the United States Government does not guarantee the obligations of the Enterprises. The Treasury Agreements do not terminate upon receivership; in receivership the quarterly funding draw is based on the difference between allowed claims and total assets.[9] To date, Treasury has infused over $187 billion into the Enterprises pursuant to the Treasury Agreements.[10]

## CONCLUSION

For the foregoing reasons, the Defendants renew their request that the Court stay this litigation during the pendency of their recently filed petition for leave from the Sixth Circuit to appeal and any appeal that may result.

Dated: May 25, 2012                                    Respectfully submitted,


                                                       /s/ Ann Marie Uetz
                                                       ANN MARIE UETZ (P48922)
                                                       ADAM J. WIENNER (P71768)
                                                       FOLEY & LARDNER LLP
                                                       *Attorneys for Federal National Mortgage Association*
                                                       500 Woodward Avenue, Ste. 2700

---

[8] *Id*. at 2-3 (definition of "Deficiency Amount"); § 2 ("Commitment").

[9] *See id*. at § 2.5 ("the Commitment shall *not* be terminable by [Treasury] solely by reason of (i) the conservatorship, receivership or other insolvency proceeding of [the Enterprise] or (ii) the [Enterprise]'s financial condition or any adverse change in [the Enterprise]'s financial condition.") (emphasis in original). *See also id*. at 2 (specifying means of computing "Deficiency Amount" in receivership).

[10] *See* Data as of May 10, 2012 on Treasury and Federal Reserve Purchase Programs for GSE and Mortgage-Related Securities, *available at* http://www.fhfa.gov/webfiles/23922/TSYSupport%202012-05-10.pdf

10

Detroit, MI  48226-3489
Phone: (313) 234-7100

CLYDE M. METZGER (P31040)
THOMAS J. FOLEY (P31111)
FOLEY, BARON & METZGER, PLLC
*Attorneys for Federal Home Loan Mortgage Corporation*
38777 Six Mile Road, Ste. 300
Livonia, MI  48152
Phone: (734) 742-1880
Fax: (734) 521-2379

ASIM VARMA (DC Lic. No. 426364)
HOWARD CAYNE (D.C. Lic. No. 331306)
MICHAEL JOHNSON (Va. Lic. No. 41588)
*Attorneys for Federal Housing Finance Agency*
ARNOLD & PORTER LLP
555 12th Street N.W.
Washington, DC  20004
(202) 942-5000
Asim.Varma@aporter.com
Howard.Cayne@aporter.com
Michael.Johnson@aporter.com

STEPHEN E. HART (DC Lic. No. 033379)
Co-Counsel for Proposed Intervenor
FEDERAL HOUSING FINANCE AGENCY
1700 G Street NW
Washington, DC  20552
(202) 414-3800
Stephen.Hart@fhfa.gov

11

## CERTIFICATE OF SERVICE

I hereby certify that on May 25, 2012, I electronically filed the foregoing *Defendants' Response to the Order Dated May 11, 2012* with the Clerk of the Court using the ECF system which will send notification of such filing to all counsel of record.

/s/ Ann Marie Uetz_____
ANN MARIE UETZ
FOLEY & LARDNER LLP
*Attorneys for Federal National Mortgage Association*
500 Woodward Avenue, Ste. 2700
Detroit, MI  48226-3489
Phone: (313) 234-7100

4838-4145-3583.1